May it please the Court, Your Honor, I'm Christopher Cannon. I represent Mirza Ali, and as I indicated, I'd like to reserve five minutes for rebuttal. The issues I'm going to address are the wire fraud issues, and it's our position that there was no wire fraud in this case. And the reason that there was no wire fraud in this case is that there was no transfer from Microsoft to the defendants in this case. Both the district court and the government's briefs ignored the issue of a transfer. Well, look, I don't quite understand that, because it wasn't the government's theory. I mean, in other words, if I got it right, your clients made a misrepresentation to Microsoft. That's correct. In order to get academic edition status. That's correct. Okay. So then they got that. And so instead of paying Microsoft what they would have had to pay them had they not made the misrepresentation and had they been treated as a nonacademic edition reseller, Microsoft lost money. One, Microsoft did not lose money. And the reason they didn't is because I think the court is misapprehending the facts as the government is trying to ignore and as the district court ignored them. The defendants in this case. Theory. I mean, what's your answer? That's the government's theory. That's what the district court said. And that's what's obvious looking down on it. But the district – but the defendants in this case didn't obtain anything from Microsoft. Everything they obtained, they obtained from independent district courts. Yes. They obtained – sure they did. They obtained the ability to resell stuff that's an academic edition, whereas if they hadn't misrepresented to Microsoft that was their status, they would never have gotten. So if they hadn't have gotten that, they would have been a dirty old ordinary reseller who would have paid Microsoft more for its product than it did. That's not an accurate interpretation of the facts, because the court keeps saying that they would have paid Microsoft, and they didn't pay anything to Microsoft. Everything they purchased, they purchased from independent – Which they couldn't have done, is my point. But the way it works, if I drew a picture of this. Okay. So you have Microsoft over here, and you have various distributors over here in the district, and they can only sell – resell to people who have a certificate as for the educational software, correct? That's an interesting theory. The fact is that Microsoft sells four times as much educational software as they sell standard software. Microsoft has put – Let's just get the shape of the table first. The shape of the table is Microsoft doesn't sell anything direct to consumers. No. I mean, that's what I'm trying to say, is that you've got Microsoft over here, and they've got distributors and people who are selling the software. Yes. Whether it's, you know, to offices, to educational institutions, to whomever. But for people, that is entities, who have purchased the software that can be resold to educational institutions, they get that price only if they certify that they're going to resell to educational institutions. Your client then basically puts themselves on an approved list, correct? Correct. And by doing that, they say that they're going to sell to approved educational institutions, correct? Yes and no, because the fact of the matter is most of the software is sold to anybody. It's a way for Microsoft to engage in price competition with counterfeit software, with other price software, and Microsoft doesn't have the legal ability to say that we're going to restrict sales by independent third parties only to so-called educational users. That's what the contract says, right? Well, there's not a contract. My client's – That's what the certification says. In other words, your client has, in effect, a dotted line back to Microsoft by having this certification that they've agreed to, right? There is a dotted line between my clients and Microsoft to a legally unenforceable promise, much like a promise on a covenant running with the land where you're not going to sell your house to black people in America. Microsoft is trying to get promises like that from individuals, but they're not enforceable promises, because once Microsoft sells the software to independent distributors, Microsoft loses the ability to determine who those independent distributors are going to sell them to. No. Not if Microsoft imposes on those independent distributors the same criteria that it has to go to at least software that they purchase for the lower price has to be sold to educational. They can't do that, because that would be an illegal tying agreement. And in this case, Microsoft's – That's an antitrust claim. Correct. You make a passing kind of antitrust argument in that regard, but do we have to accept that argument in order for you to win? Absolutely not, because the argument that you have to get around, which for me to lose, is that there was a transfer of something from Microsoft to the defendants in this case. Where do we get that word transfer? In Carpenter, in McNally, in Millwitt, and in Lew, in all of those cases, they say that to be guilty of Microsoft, the item that's transferred has to be property in the hands of the victim. The difference is here you've got a misrepresentation made to Microsoft. Absolutely. It would never have been on the playing field without that misrepresentation to Microsoft. But the – The fact that Microsoft, relying on their representation, said, sure, now you can go buy from our distributor. Without that okay, none of this could have ever happened, right? No. You're assuming facts, not in evidence. The fact that's not in evidence that you're assuming is that the defendants in this case could not have bought without the certification of Microsoft. There's nothing to indicate that that's true. It's clear that's what Microsoft – They have bought at the reduced price. Microsoft filed a declaration saying that they don't control the prices that the distributors sell at. So the distributors are completely independent entities. What happens is Microsoft sells the goods to the distributors. The distributors then sell the goods to whoever they want and at whatever price they want. Microsoft tries to impose a control on the people that buy from the distributors, but that control is ineffectual. It's ineffectual in reality when you look at the four-to-one ratio of educational to regular software, and it's ineffectually contractually. So there was no transfer of any goods from Microsoft to the defendants in this case. Let me ask you a question. It's my understanding that for a mail-or-wire fraud conviction to stand, there must be some level of convergence between the deceived party and the victim. My worry is that I can't find case law that would suggest that this has to be a strict convergence. In other words, that there is no case law that says that there must be some strict convergence between the deceived party and the victim. And when I'm reviewing this on a sufficiency of evidence review and I'm looking at the I can undo what the district court had in front of him with full ability under the facts to get the intendment of the facts and what they said that there wouldn't be mail-and-wire fraud conviction. Because under the law, there's nothing that says it has to be a strict convergence. But it clearly says under the law that there has to be a transfer from the victim to the so-called fraudster. And in this case, nothing was transferred from Microsoft to the defendants in this case. There was no software sold by Microsoft. There was no transfer. Microsoft sold the software to independent third parties. The defendants bought the software from independent third parties, paid full price for that, and sold it to whoever they chose. There may be an argument that Microsoft may be unhappy. Microsoft may have a civil case against them. But this is not a case of wire fraud, since there was no transfer of anything from Microsoft to the defendants in this case. Now, I'll let Ms. Landau go. Kagan. Thank you, Mr. Kagan. Ms. Landau. Landau, may it please the Court. I'm just briefly going to talk about the money laundering, the money laundering charges. So since the Van Alsten decision, as Judge Rimer was asking in the previous case, the Van Alsten decision turned on this concept of the merger doctrine. Well, so under Van Alsten, it's quite clear that the promotional money laundering counts in this case, which I believe counts 11 to 20. I may be wrong on the number. But they are all promotional money laundering. They are based on the defendant's use of monies to purchase both corporations, which were used to buy software, and also to buy the software itself. But that's not the case with respect to the money that was transferred to Pakistan or to the kids. Yes. Those counts will fall under Regulat Acquittal. So you agree that as to 21 to 30, that the analysis is simply whether there are proceeds. Excuse me, whether there are gross proceeds. Well, I don't, Your Honor. I actually don't. I think that Van Alsten, in that, first of all, with all due respect to this Court, I do believe that Van Alsten's narrow focus on the merger doctrine is incorrect. And obviously, you're bound by it to the extent that it remains final. But I think that there are a couple of things in this case. You know, Van Alsten didn't talk about the difference between gross receipts and profits. And that, as I said, that is self-evident. So the question, at least as I read Van Alsten, and I agree with you, it may not be correct, but for a different reason. I think we may disagree on that, Your Honor. But at least as I read it, it focuses on whether there's a merger. And if there's a merger, then proceeds is defined as profit. If there isn't a merger problem, then proceeds is defined as we always have defined it in the past, which is gross receipts. Well, Your Honor, I'm not sure that that's correct. I think that this case is distinguishable from Van Alsten on that ground. Van Alsten, first of all, did overrule. It ruled that Ocantobi was overruled, just as the Third Circuit ruled in Yusuf that Grasso was overruled. So to the extent that we're talking about gross receipts, that's, you know, the definition is no longer gross receipts in this circuit.  But it's either profits or, I mean, you have to decide what proceeds means, and it's either profits or it's something else. What else would it be, other than gross receipts? Well, there are actually, there's net profits, there's gross receipts, there's gross profits. There are a lot of potential definitions that have been argued. Okay. I'm not sure I, you're making, are all these criminal enterprises now supposed to be accounting under GAAP? Well, perhaps, Your Honor, but if I could, let me just, I'll make the point that I was trying to make. I think that this case is factually distinguishable from Van Alsten, and I don't know that Van Alsten would control it on the merger. And the thing is, is that Van Alsten involved a Ponzi scheme. And so to some extent, all the proceeds, whether gross receipts or whatever, were illegal, innately illegal, because the whole scheme was illegal. This scheme, and I'm not going to belabor the wire, the wire fraud point, but this involves selling a completely legal product, and then the use of the monies thereafter. So in that sense, I think there may be some higher standards shown or required in order to say, well, this is, this is proceeds. I think it, given that this is a completely legal profit, where products go. Where does that theory come from? It's, it doesn't come from Van Alsten. It's not true. It doesn't come from anywhere else. It's from Ms. Landau's creative mind. That's correct. I just wanted to know if that, you know, I mean, it has some facial appeal, but I'm just not sure that that's ever been the law. I don't have a case to cite you for it, Your Honor. But it does sort of, I mean, I think in a way, if you look at Regalado-Quaylar, which applies to the, the exportation and the concealment counts, you know, one of the things is that to prove concealment, when you're talking about the related field of concealment money laundering and exportation money laundering, well, exportation, you can either have it be promotional or concealment. But when you're talking about concealment, the fact of, the fact of hiding is not the same as intent. In other words, the fact that something has the effect of hiding something does not suffice to prove intent. And in the same way, when you have a completely legal product, and in Santos itself, given the split decision, there were a lot of judges who seemed to be quite convinced that money derived from drug trafficking, for example, should be treated differently than money derived from other illegal enterprises. And in fact, Yusuf drew that line, and Yusuf said, okay, you know, this is not contraband. This is, this is a mail fraud case, and we are going to assume here that the profits definition applies. So I guess it does come, what I'm saying, comes from Yusuf and from, and Santos itself. I mean, obviously, the circuits are split, you know, more than three ways on this, this topic on how, what does Santos mean, what does Regalado-Coelho, well, Regalado-Coelho, there's not a split, but that's, that's the situation. So, I mean, that is, that is my, I do think in this case there needs to be showing of profits, and there was none, and there's none in the stipulated facts. The stipulated facts are also wholly inadequate in terms of intent. There is no stipulation about that the money was transferred with any intent to conceal or any intent, well, it falls under promotion, so we really just have intent to conceal. So those are our points on money laundering. I, I mean, I think, we also argued, the other thing I would turn to is the forfeiture. And the problem with the forfeiture, of course, is that, well, obviously, if the mail fraud counts are reversed, it falls. But the forfeiture was explicitly tied to money laundering and to this completely inapplicable statute. And even though forfeiture is, is part of punishment, it is in this quasi-status. And I think, and, and this Court has always been quite firm about requiring adequate notice. And what we have here is we have an indictment that is simply insufficient on the question of the forfeiture. If there's no questions on the money laundering, I'm, I'm, I will submit and we can Mr. Cohen has any points he would like to add. Okay. Mr. Cohen. Good morning, Your Honors. As, as, as we pointed out in our briefs, we, we think that it's very important in the stipulated facts context that the parties stipulated that what we all need to look at to determine what the overall structure here is, is, are the contracts themselves. That's all there is really to look at. And I was listening to the discussion with Mr. Cannon, and it seems like there's, there were two issues that came up on, on the question of money or property. One is, is this certification. In other words, that it's undisputed that Microsoft gave the defendants permission to purchase the property from the distributors at the educational price. In other words, that's what they got from Microsoft. They didn't get the software from Microsoft. They didn't get any actual property from Microsoft. And it's also undisputed that there's no agency relationship between the two. The distributors are completely separate. The distributors purchased the property for full price, got it. It was resold for full price. So what was it that the defendants got from Microsoft? And as Judge McKeown pointed out, it was this contractual right. When you say full price, what do you mean by that? What I mean is, is the distributors, it's undisputed in this evidence that the distributors paid Microsoft whatever Microsoft needed to charge, whatever their requirement was for the distributors to obtain the, the software. Well, it wasn't sort of whatever. They actually, if I read the stipulated facts where I think it's the only place I could get this. It's the only thing that is. Is that they were getting something off of the ordinary price. Is that not true? No. What I'm saying is, is that the distributors purchased the software for the price that Microsoft charged. And Microsoft charged that price because it was for the educational arena. But what I'm, but the. Yes or no on that point? On that point, yes. Okay. But the relationship between the distributors and Microsoft was a completely separate relationship. The distributors paid whatever they paid under their contract. We've got the contract. Then they obtained, the distributors obtained the Microsoft, the software. They had it. The transaction is finished. Now the defendants approach the distributor and the defendants pay full price for the. What do you mean full price? The AAR. The educational price. Sure. I mean, that's a little deceptive to say that's the full price. Because the whole thing is about whether there is a delta in effect. I understand. Because you get this education certification. I understand that. But I'm not trying to be deceptive. I'm just, I understand that there's two different prices. There's the educational price and there's the full price. I'm not talking about that. I'm talking about the fact that there were two completely separate transactions between what are acknowledged to be independent entities without an agency relationship. The first transaction was between the distributor and Microsoft. They got the software. It was fully paid for. And now that software is owned completely by the distributor. They actually have it. They own it. They paid, you know, whatever, that's why I say whatever the price. I'm not talking about, they paid for it. They have it completely. They own it completely. You would agree it's a discounted price, correct? Yes. Then the defendants come to the distributor and they say, we want to pay for the software. And the distributor says, well, are you on the approved list? They show them that they're on the approved list. And they pay full price and there's a transfer. But the point we're trying to make is that there's two completely independent and separate transactions. What was it that was obtained by the defendants? It was this right to be on the approved list. It was this contractual right. So what I wanted to do was direct your honors and the court to the points that we made in our briefs and in the reply brief that what really did they obtain from Microsoft? And we believe it's similar to this regular, you know, it wasn't a license in the sense that it was a license to use intellectual property. What was it? It was this kind of regulatory license. That's what they obtained. While it wasn't a... What you're really talking about then is you really want to go under Cleveland. Exactly. Why is it not Pasquantino where, in fact, the right to receive the payment, the correct payment for the goods that were given was what they took. The right to receive the right payment for the goods they got is property. That's what Pasquantino says. So when we go back to property itself, it seems to me that they took a right to receive full payment. Now, that's why I thought Judge McEwen's questions were good. They took that right to receive all the payment they could have received away from Microsoft because by them certifying to what they were doing, by them doing what they did with the third parties, they, in fact, allowed then someone to buy stuff from Microsoft at a lower cost and to sell them to them at lower cost than what they would have had to pay. Why is that not Pasquantino in its entirety? I mean, you want to make it into a license just to make it Cleveland. Well, why is it not Pasquantino? Because the cases, Cleveland, Brookhousen, they talk about this specific fact pattern, which is while it was in the government context, in this case, we're talking about a contractual regulation of the marketplace. Pasquantino was not a contractual regulation of the marketplace. We're talking about it was not a regulation of the stream of distribution. These cases that we cited we think are directly on point. And it's not that we're trying to deceive anybody or say it's a license. We're saying it's supposed to be a license when it's not. The government now belatedly is talking about it being a license. But to us, that's the only possible argument there can be here because of the fact that there was no agency relationship. And, Your Honor, it's – What about like the Weinstein case? In Smell, sort of, this is closest to these pharmaceutical cases of the cases I've been able to find. So it's not like selling, you know, arms to the Russians or various things. So in these pharmaceutical cases, as I understand them, they're basically saying even though there's a third party there who may, in effect, service a pass-through, you still have a, you know, a violation of statute. And so I'm looking to those as an analog, although they're not perfect. So I'm interested in your comments on that. Well, I'm just – I guess I'm – I guess I'm a little bit at a loss because of the Weinstein case I'm not completely familiar with. But also their discounts. Their discounts, in effect. In effect. Spencer and Weinstein is the – yeah, you get the discount from the pharmaceutical and you get to pass it on, in effect. So they have the same structure, more or less, as your situation. Well, again, the issue here, the question here – first of all, I think that that's the issue, what we're talking about, is how do we – how do we define this? Do we just define it under Pasquantino? Do we define it under Cleveland? Do we define it under these pharmaceutical cases? No, I just – I'm just really simple-minded about this. These folks defrauded – they represented something to Microsoft. It wasn't true. They got them the ability to buy product at a lower price than they would have gotten had they been truthful. That's it. Well, they got it. I don't care what labels you want to put on it. I don't care whether it was, you know, what it was. That's what happened. So why isn't that enough? Well, because the question – because, you know, Judge Smith talks about whether – or asked a question about whether there's a strict convergence doctrine or a non-strict convergence doctrine. And, you know – Okay. Well, again, forget being fancy, okay? But, no, no, I'm – I just described a real simple scenario. Why isn't that – I know. I know. I know. I understand that. But that's – I'm trying to answer the Court's question. I mean, yes, the – you're saying to us, well, there is a lie here. There was a lie here to Microsoft. And we're saying they didn't obtain money or property. And the Court's saying, well, wait a second, they lied and they obtained some – down the road. Do you want to save time for rebuttal? I do, but I'm – I'm trying to answer. Okay. I'm fine, okay, with the question. No. Never mind. I think in fairness to counsel, we – Okay. Can I just get this one sentence out, please, Your Honor? That there – that Lew and the cases since Lew, and we showed that in our briefs, in this circuit, there is no such thing as a non-strict convergence doctrine. It's strict. And while that might appear to be something that doesn't account for these lies, there has to be strict convergence. And then you've got to look at the Cleveland-Bruckhausen cases. Thank you. Good morning. May it please the Court. Hartley West for the United States. I'm going to limit my comments to those issues raised by counsel unless the Court has questions about some of the issues raised in the brief. And with the Court's permission, I'd like to try to reserve probably about three minutes of my time for rebuttal on the cross-appeal. The Court's questions, I think, have nailed it correctly. It wasn't argued, so I don't think that's necessary. Okay. Thank you. For the sufficiency of the evidence on the mail fraud and the wire fraud, counsel said that they were just talking about the wire fraud, but because their arguments pertain both to mail fraud and wire fraud, I'll address my comments to both. And I do think that the Court focused on the correct cases with Pasquantino, Weinstein, and this is also like Stewart and Robertson. And in particular, I'd like to draw the Court's attention to the Robertson case, which quoted another case, United States v. Coviello, and it quoted that case talking about it doesn't matter that the defendant sales might not have displaced $17 million worth of legitimate Microsoft product. What matters is that the stolen CD-ROMs contained intellectual property that was worth between $10 and $20 million if they had been sold legitimately. And that Coviello case is a pass-through case like this. And in Coviello, the Court did look to see whether Microsoft could legitimately be the victim, even though the products were not obtained directly from Microsoft. And so because there was sufficient ---- Can I go back on Robertson? Because I was kind of excited that it might be close to this situation. And then looking at it closer, wasn't there a direct relationship between Novell, who's like Microsoft, and the defendants? There was in Robertson. And that's why ---- Direct purchase so that the argument they're making isn't really answered by Robertson. That's correct. And that's why I think that Robertson's quotation of the Coviello case is particularly helpful. Although we did not cite Coviello ourselves in the brief, Robertson does quote it. And in the Coviello case, there was that intermediate relationship such that the whether Microsoft was a victim, even though the products had not been acquired directly from Microsoft, but from its distributor, KAO. And so Robertson quotes Coviello. I would ask the Court if it could look at that. I think that is instructive on the pass-through relationship. In addition, one of defense counsel mentioned, and I think this was already corrected, but I just want to make sure for the record, they contended that the they couldn't do that under the terms of the contract absent the fraud here. The contracts require the distributors to obtain written approval from Microsoft in order to be able to sell this educational software. And they did obtain that through these certifications, which the stipulated facts make clear could not have been obtained from Microsoft absent the false representations by the defendants. I'd like to turn then to the sufficiency of the evidence on the money laundering counts. I'll just go back a minute. Yes. Although I don't disagree with Judge Reimer, you know, it's clear what went on here. The difficulty is trying to fit it in the statutes as charged. And I'm still having some difficulty with the notion that, you know, while they got a certificate that it really was the distributors that were selling the software, and it was up to the distributors to determine to whom they sold the software, and that, you know, once it left Microsoft's hands, basically Microsoft was done with it. And I think that's, if I hear their argument correctly, that that's what they're saying. Would you respond to that point? Yes. I do read that as their argument as well. And here we have evidence from the stipulated facts, as I think the Court has acknowledged, that the defendants had to buy the software through the distributors. They could not acquire it from Microsoft directly, and that's at excerpt of Record 3. Then we also have the distributors required written approval from Microsoft in order to sell this educational software to a particular reseller. That's at excerpt of Record 345. Then we also have a stipulated fact that Microsoft would not approve these, the defendants' AER agreements, the educational reseller agreements, without their false statements. That's at ER 6 through 11.  So given that the distributors were contractually bound to distribute the educational software only to people and resellers that Microsoft had approved, the only way that the defendants could have committed this fraud is exactly the way they did it. The only way they could have gotten educational software at the reduced price to then sell for a profit, which they admitted was their intent, was to make those false representations to Microsoft. Now, that's actually very close to what the facts were in the Coviello case. So they're basically the representation part of the statute is the representation to Microsoft. The representation to Microsoft. The property is the software. The property is the software. It's also the revenue lost, the delta, as the Court referred to. And in Coviello, it was actually very similar. There was a distributor, KAO, to whom Microsoft had given the software to put on disks and then to distribute. These were CD-ROMs involved there. And then this was actually an ITSP conspiracy case in Coviello. It was not wire fraud or mail fraud. But the Court did have to consider from whom the property was stolen and was it stolen from Microsoft, even though it was actually stolen from the distributor. And the Court said there, Microsoft, from the contracts, retained ownership rights in the software, in the intellectual property. Although the distributor owned the physical disks, Microsoft did own the intellectual property, and it was the intellectual property in the software that the defendants wanted to buy and sell. And for those reasons, the Court there found that Microsoft was a victim. And here, similarly, Microsoft was controlling the release of the software. They controlled it through the distributors. So Microsoft still retained its intellectual property rights in the programs and so forth, and so although the disks were bought from the distributor, Microsoft very carefully and meticulously controlled the release of that software to resellers, including the defendants here. They could not have gotten that software in any way other than through the false representations to Microsoft. And so for that reason, I do think that the fraud is on Microsoft and, again, Robertson, which we do cite in our briefs, quotes Coviello, and I do think that case supports us. If there are no further questions on that, I would turn to the money laundering counts. Van Alstyne does appear to hold that there is, as does Santos, that there is this two-tier process. Van Alstyne's interpretation of Santos is, I think as the Court agrees, first, is there a merger problem? And second, if there is a merger problem, can the government show profits? Here, there were two types of money laundering that were charged. There were concealment. The funds being sent to Pakistan was on export theory. And then there was the funds being put into real estate. And those were all the last 10 counts of the indictment. Then there were an additional 10 counts, counts 11 through 20, that were promotion money laundering. For none of these counts was there a merger problem. First, for the concealment transactions, the buying the property in the son's name and exporting the money to Pakistan, none of those are alleged to be essential to the wire fraud or mail fraud schemes here. So then we turn to the promotion transactions. And I don't think that there's a merger problem there either. Because first, this is like the completed phases that the Court was referring to, I believe, in the Quan case before ours. By the time of the first money laundering transactions in this case, charged from October 1999, was the first of the money laundering counts, the fraud scheme had already been underway for almost two years. I understand that, and it makes a lot of common sense to suppose that that's true. But where does that appear in the stipulated facts? The facts of when, how long the fraud had been ongoing? No. Well, that too. But I mean, that from the, I mean, it stands to reason that from, that transaction number one, whenever it occurred, is home free under Van Alstyne. But transaction number two, you would think commonsensically, would require profits or else a staggeringly good line of credit in order to pull it off. But where is that in the stipulated facts? I just don't see it. Well, I think the stipulated facts actually do get us there. And obviously, the stipulated facts didn't couch it as profits or gross receipts, seeing as it was significantly in advance of Santos. But I think that we can get there from the facts beginning with paragraph 17 on page 7 of the excerpts of record. Now, the first of the newly formed companies, that transaction, and that also coincides with the beginning of the alleged fraud scheme, January 15, 1997. And if you look at the last sentence of that first paragraph of 17A1, it states, During 1997, EVAR purchased slash acquired a large quantity of the AE software before being terminated by Microsoft from the AER program. So that's phase one. That's EVAR. We don't know the quantity that they purchased, but we do know that it happened It was large and that it happened in 1997. We get more specific with company number two, Tech Inc. And that is paragraph two. If you look in the middle of page eight of the excerpts, there it states, I'm sorry, this is, it's Tech Inc., but it's also known as Adobe Systems. And on page eight it states in the stipulated facts, Between January and March 1998, the Ahlees, in the name of Adobe Systems, purchased slash acquired more than $2.3 million worth of AE software from Ingram Micro, again, before being terminated from the AER program. So that brings us up through March of 1998. We already have more than $2.3 million. If we go then to paragraph four, which is on page nine, at the end of that page, we now have between February 1998 and September 1999, the Ahlees purchased more than $17.9 million of AE product under the Wellstone AER application before being terminated from the program. So now we know that by the time of September 1999, the defendants have acquired $17.9 million plus $2.3 million plus an amorphous large quantity. So we have over $20 million of product out of the total, adding up the numbers through these paragraphs, of approximately $30 million that they acquired during the entire scheme. So about two-thirds of all of the product that they bought during the entire scheme had already been acquired before their terminations by Microsoft by September 1999, before the first money laundering transaction. After that, there's only approximately $10 million that are acquired. And given that fact, together with the fact that this is – I do view this as a phase-type scheme where they are acquiring additional inventory, it's expanding the scope, it's not paying off expenses that were already incurred. Now, if this had been just, for instance, solely the Wellstone company and solely purchasing the $17.0 million, then the purchase or any payments made to acquire the Wellstone company or to purchase the products that they purchased would be costs of the scheme. Those would be expenses. But where those all happened and $20 million of the total $30 million all happened before the first money laundering conviction, I do think that there is evidence both to show that there was not merger and that even if this were a merger case, that that did involve profits. It's – although it's not part of the stipulated facts, it is perhaps worth noting that during the sentencing phase, the court did find that the defendants, in fact, made more than $5 million of profits. But the government concedes that that was not part of the stipulated facts here.  in their opening argument was the forfeiture error. I'd like to draw to the court's attention that this is the first time on appeal that that error has been raised. It was not raised below through any sort of objection. And the government believes that the Sylvia's case is entirely dispositive here. There was an erroneous citation of Section 982 as the statutory basis for the financial institution. But that does not warrant reversal under Sylvia's for two reasons. First, because it was not at a constructive amendment. Forfeiture is part of sentencing. It's not one of the charges of an indictment. And therefore, it doesn't arise to constructive amendment of the elements of a crime. And second, because under Sylvia's also, the defendants were on sufficient notice. The purpose of the forfeiture allegation, according to Sylvia's and Edelkind and other cases, is to inform the defendant that the government intends to seek forfeiture. Here, the government did state that it was intending to seek forfeiture. It identified the counts that that was based on as counts 1 through 30. And it, in fact, identified the targeted assets. So given that, the government would suggest that and argues that there is no forfeiture error here. In fact, none of the claimed errors warrant reversal. Accordingly, the government asked this Court to affirm the convictions and the sentences in their entirety. If there's no further questions, by the Court will submit on the briefs. Thank you. Thank you. Mr. Canne. Thank you, Your Honor. Your Honor, I'll try to be very brief. This is and sometimes it's difficult to respond to something co-counsel says, but I think it's really important that we respond. This is not a discount case. There were no discounts in this case. The different products carried different licenses and were sold at different prices. This is not a discount case. If the defendants obtained a contract from Microsoft, that contract that they obtained from Microsoft would be intangible. It's not property. As I stood up here before and said again and again and again, there has to be a transfer of a tangible right from Microsoft to the defendants. There was no such transfer of a tangible right. This case is very different than Pass Quintino. The reason it's different than Pass Quintino was in Pass Quintino you had Canada, a sovereign nation, trying to collect its excise taxes. Those excise taxes are fixed. They're in a schedule and the defendants in that case were trying to avoid paying the fixed excise taxes to the sovereign Canada by smuggling in the goods to avoid the taxes. That's what happened in Pass Quintino. This case is very, very different because in this case Microsoft specifically said it didn't fix the prices. It didn't set the prices. It sold the goods to the third party independent distributors at the independent price negotiated between Microsoft and those distributors. Those distributors then negotiated another price between the defendants and themselves. What was this restriction on the distributors in terms of sale of the educational software? It's kind of a multi-level marketing program by Microsoft and Microsoft tries to contractually restrict each level of reseller from reselling the product. The question is can they? The answer to that latter question is no, they cannot. But they clearly put that term in the contract. But a term in a contract is a contract term, is an intangible right, is not property, and is not something that's transferred. The government kept talking about Covello, which was a case cited in Robertson, indicating that that's somehow persuasive. It's not persuasive because it's an interstate transportation stolen property case, much like the case Marty Leone that they cited in their 28J letter. In both of those cases, the government had the good sense to realize that the conduct alleged in those cases wasn't a wire fraud. In both of those cases, there was different crimes that the conduct fell under. There were different statutes that could have been charged. But in neither of those cases did that conduct fall under the mail and wire fraud statute, just like the mail and wire fraud statute doesn't cover the conduct here because there was no transfer from Microsoft to the defendants. The court asked a question about to the government regarding the forfeiture counts and the merger and indicated because this scheme went on for a long period of time, somehow at some point there must have been net proceeds to the defendant. The answer to that question is, one, you can't arbitrarily cut something off. I've sat here and argued many times that the conspiracy continues and the conspiracy is to make a net profit in the end. That's one question. Two, there are two other answers to that. The stipulated facts do not contain any evidence regarding what the defendant's initial capitalization was and what their credit line was with the banks. And there is evidence in the indictment that there were credit lines involved. So it's very clear that there is no showing that there was any kind of gross proceeds or net proceeds at the end. And finally, the government is trying to sustain the forfeiture under the Seventh Circuit case of Silvius. To accept Silvius, this Court has to completely read out of existence Federal Rule of Criminal Procedure 32.2, which simply says you have to cite the statute that you're trying to forfeit something. It's crazy for the government to litigate a forfeiture under one theory, for there to be extensive briefing on that theory, to then come up at the last minute and come up with a completely different statutory basis for the forfeiture and give no notice to the defendants at all, and then to claim that this is something. If the government wants to proceed on another theory, they can try to proceed on another theory. They can try to proceed on a civil forfeiture theory, but this Court should not follow Silvius, it should follow the clear language of Federal Rule of Criminal Procedure 32.2. Thank you. Thank you, Mr. Cannon. Thank you, counsel, all of you. The matter just argued will be submitted and the Court will stand in recess for the day.
judges: Rymer, McKeown, Smith M.